JOHN O'GRADY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

COLUMBUS SURGICAL CENTER LLC
NONE GIVEN
NONE GIVEN, ZZ 00000-0000,

PLAINTIFF,
VS.
NUETERRA HOLDINGS LLC
% CORPORATION TRUST CO
CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON, DE 19801-0000,
DEFENDANT.

05CVH-06-6558

CASE NUMBER

**** SUMMONS **** 06/16/05

TO THE FOLLOWING NAMED DEFENDANT:
NUETERRA HOLDINGS LLC
% CORPORATION TRUST CO
CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON, DE 19801-0000

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY: COLUMBUS SURGICAL CENTER LLC
NONE GIVEN
NONE GIVEN, ZZ 00000-0000,

PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
GERARDO ROLLISON
ATTORNEY AT LAW
2663 BARRINGTON DRIVE
TOLEDO, OH 43606-0000

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

JOHN O'GRADY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY: SANDY THOMAS, DEPUTY CLERK

JOHN O'GRADY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

JUDGE D. CRAWFORD

COLUMBUS SURGICAL CENTER LLC,

PLAINTIFF,

VS.

NUETERRA HOLDINGS LLC,

DEFENDANT.

05CVH-06-6558

CASE NUMBER

CLERK'S ORIGINAL CASE SCHEDULE

| | LATEST TIME OF OCCURRENCE |
|---|---|
| CASE FILED | 06/16/05 |
| INITIAL STATUS CONFERENCE | ******** |
| INITIAL JOINT DISCLOSURE OF ALL WITNESSES | 11/03/05 |
| SUPPLEMENTAL JOINT DISCLOSURE OF ALL WITNESSES | 12/29/05 |
| TRIAL CONFIRMATION DATE | 01/12/06 |
| DISPOSITIVE MOTIONS | 03/23/06 |
| DISCOVERY CUT-OFF | 04/06/06 |
| DECISIONS ON MOTIONS | 05/18/06 |
| FINAL PRE-TRIAL CONFERENCE/ORDER (OR BOTH) | ******** |
| TRIAL ASSIGNMENT | 06/15/06 1030AM |

NOTICE TO ALL PARTIES

ALL ATTORNEYS AND PARTIES SHOULD MAKE THEMSELVES FAMILIAR WITH THE COURT'S LOCAL RULES, INCLUDING THOSE REFERRED TO IN THIS CASE SCHEDULE. IN ORDER TO COMPLY WITH THE CLERK'S CASE SCHEDULE, IT WILL BE NECESSARY FOR ATTORNEYS AND PARTIES TO PURSUE THEIR CASES VIGOROUSLY FROM THE DAY THE CASES ARE FILED. DISCOVERY MUST BE UNDERTAKEN PROMPTLY IN ORDER TO COMPLY WITH THE DATES LISTED IN THE RIGHT-HAND COLUMN.

BY ORDER OF THE COURT OF COMMON PLEAS,
FRANKLIN COUNTY, OHIO

__/__/__
DATE

JOHN O'GRADY, CLERK

(CIV363-S10)

# IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| Columbus Surgical Center, LLC | ) | Case No. 05CVH 06 6558 |
| Plaintiff, | ) | Honorable |
| v. | ) | **COMPLAINT WITH INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION ATTACHED** |
| Nueterra Holdings, LLC,<br>formerly known as ASC Group, LC | ) | |
| c/o<br>The Corporation Trust Company | ) | Gerardo R. Rollison (0027088)<br>Jennifer J. Dawson (0033707) |
| Corporation Trust Center<br>1209 Orange Street | ) | MARSHALL & MELHORN, LLC<br>Four SeaGate, Eighth Floor |
| Wilmington, Delaware 19801 | ) | Toledo, Ohio 43604 |
| Defendant. | ) | (419) 249-7100<br>(419) 249-7151 (Fax) |
| | ) | |
| | ) | Counsel for Plaintiff<br>Columbus Surgical Center, LLC |

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
05 JUN 16 PM 4:08
CLERK OF COURTS

1. Plaintiff, Columbus Surgical Center, LLC, ("CSC" or the "Company") is an Ohio limited liability company with its principal place of business located at 5005 Parkcenter Avenue, Dublin, Ohio 43017. CSC was formed for the purpose of operating a surgical center.

2. Defendant, Nueterra Holdings, LLC, formerly known as ASC Group, LC ("Nueterra/ASC"), is a Delaware limited liability company, and a Member of CSC. Nueterra/ASC does business in Franklin County, Ohio.

3. Nueterra Healthcare Management, LLC, formerly known as ASC Management, L. L.C. ("Nueterra/ASC Management") is a Delaware limited liability company and an affiliate and/or wholly owned subsidiary of ASC. Nueterra/ASC Management manages numerous surgery centers in

Franklin County, Ohio, including but not limited to CSC.

4. Defendant Nueterra/ASC, as a member of plaintiff CSC, executed a contract effective August 13, 2002 entitled Operating Agreement of Columbus Surgical Center, LLC, (the "Operating Agreement"), a copy of which is attached hereto and incorporated herein as Exhibit A.

5. The Operating Agreement at Section 4.9 provides in pertinent part that "No Member of the Company may, directly or indirectly or through one or more Affiliates invest in or possess a financial interest (whether as owner, security holder, creditor, consultant or otherwise) in any healthcare facility that offers services similar to those offered within the Facility that operates in whole or in part within a 30 mile radius of the Facility." Facility is defined in the Operating Agreement as a surgical center operated by CSC at the Columbus, Ohio site.

6. The Operating Agreement provides that Nueterra/ASC agrees that the restraints imposed by Section 4.9 of the Operating Agreement are "reasonable as to time, scope and geographic limitation...."

7. Upon information and belief, Nueterra/ASC, directly or indirectly, or through one or more of its affiliates including Nueterra/ASC Management, invests in or possesses a financial interest (whether as owner, security holder, creditor, consultant or otherwise) in one or more health care facilities that offer services similar to those offered by CSC operating in whole or in part within a thirty mile radius of CSC, including in Franklin County, Ohio.

8. On or about April 26, 2005, CSC delivered to Nueterra/ASC correspondence constituting notice (the "Notice") that:

a. Nueterra/ASC is in breach of Section 4.9 of the Operating Agreement as a result of the interest of Nueterra/ASC or its affiliates in competing surgical centers within a thirty mile radius of CSC;

b Nueterra/ASC's breach of Section 4.9 of the Operating Agreement constitutes a Buy/Sell event pursuant to Section 13.1.4 of the Operating Agreement;

c. Nueterra/ASC's failure to provide CSC with notice of an interest in competing facilities within the thirty mile radius is in breach of the Operating Agreement and other agreements to which Nueterra/ASC and CSC are parties; and

d. CSC intends to exercise, pursuant to Section 13.3.1 of the Operating Agreement, its option to purchase Nueterra/ASC's units.

9. Despite receipt of the Notice, Nueterra/ASC has failed to cure its material breaches of the Operating Agreement and refuses to sell its units in CSC.

**Claim One**

10. CSC incorporates as though fully rewritten herein the allegations set forth above.

11. Nueterra/ASC is in material breach of Section 4.9 of the Operating Agreement by directly or indirectly, or through one or more affiliates investing in or possessing a financial interest (whether as owner, security holder, creditor, consultant or otherwise) in a healthcare facility offering services similar to CSC, operating in whole or in part within a thirty mile radius of CSC.

12. As a result of Nueterra/ASC's material breach of the Operating Agreement, CSC has suffered damages in an amount not yet determined but estimated to be in excess of $25,000.00.

**Claim Two**

13. CSC incorporates as though fully rewritten herein the allegations set forth above.

14. Nueterra/ASC's material breach of Section 4.9 of the Operating Agreement constitutes a Buy-Sell Event pursuant to Section 13.1 of the Operating Agreement.

15. Nueterra/ASC failed to give notice of such Buy-Sell Event in material breach of Section 13.2 of Operating Agreement.

16. As a result of Nueterra/ASC's material breach of the Operating Agreement, CSC has suffered damages in an amount not yet determined but estimated to be in excess of $25,000.00.

Wherefore, CSC demands:

a. a declaration from this Court that ASC is in material breach of the Operating Agreement;
b. an Order from this Court that Nueterra/ASC be required to sell, and CSC be permitted to purchase, Nueterra/ASC's units in CSC pursuant to Section 13.3 of the Operating Agreement;
c. judgment against Nueterra/ASC and in favor of CSC in an amount yet to be determined but in excess of $25,000 in damages incurred by CSC associated with Nueterra/ASC's breach of the Operating Agreement;
d. an award of attorney fees and expenses incurred herein; and
e. any other relief deemed just and appropriate by this Court.

Respectfully submitted,

Gerardo R. Rollison
Jennifer J. Dawson

By [signature]

IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| Columbus Surgical Center, LLC | ) | Case No. |
| Plaintiff, | ) | Honorable |
| v. | ) | **COLUMBUS SURGICAL CENTER, LLC'S FIRST SET INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION** |
| Nueterra Holdings, LLC, formerly known as ASC Group, LC | ) | |
| Defendant. | ) | |
| | ) | Gerardo R. Rollison (0027088)<br>Jennifer J. Dawson (0033707)<br>MARSHALL & MELHORN, LLC<br>Four SeaGate, Eighth Floor<br>Toledo, Ohio 43604<br>(419) 249-7100<br>(419) 249-7151 (Fax) |
| | ) | Counsel for Plaintiff<br>Columbus Surgical Center, LLC |
| | ) | |

Plaintiff Columbus Surgical Center, LLC, ("CSC") hereby serves upon defendant the following Interrogatories, Requests for Production of Documents and Requests for Admission pursuant to Rules 33, 34 and 36 of the Ohio Rules of Civil Procedure. Defendant should respond by sending a copy of its responses to plaintiff's counsel at the office of Marshall & Melhorn, Four SeaGate, Eighth Floor, Toledo, Ohio, 43604 within twenty-eight (28) days of service. Defendant shall supplement its responses in accordance with Rule 26(E) of the Ohio Rules of Civil Procedure.

**INTERROGATORY NO. 1:** State the name, address, and title of each person providing information upon which the answers to these discovery requests are based.

**ANSWER:**

**REQUEST TO ADMIT NO. 1:** Admit that Nueterra Healthcare Management, LLC, formerly known as ASC Management, L.L.C. ("Nueterra/ASC Management") is an Affiliate (as defined in 2.1.4 and 2.1.8 of the Operating Agreement attached to the Complaint as Exhibit A) of Nueterra Holdings, LLC, formerly known as ASC Group, LC ("Nueterra/ASC").

**RESPONSE:**

**INTERROGATORY NO. 2** If your response to Request to Admit No. 1 is anything other than an unqualified admission, please state specifically the reason therefore and describe specifically the relationship between Nueterra/ASC Management and Nueterra/ASC.

**ANSWER:**

**INTERROGATORY NO. 3:** Identify any and all health care facilities located within a thirty mile radius of CSC, in which Nueterra/ASC or Nueterra/ASC Management, or any of their affiliates (as defined in section 2.1.4 of the Operating Agreement attached to the Complaint as Exhibit A, hereafter "Affiliate" or "Affiliates"), have an ownership interest.

**ANSWER**

**INTERROGATORY NO. 4:** With respect to any facility identified in response to interrogatory no. 3 above, identify the date on which such ownership interest was acquired.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 1:** With respect to any facility identified in response to interrogatory no. 3 above, produce or provide for inspection the documents evidencing such ownership and the date upon which ownership was acquired.

**RESPONSE:**

**INTERROGATORY NO. 5:** Identify any and all health care facilities located within a thirty mile radius of CSC, with which Nueterra/ASC or Nueterra/ASC Management, or any of their Affiliates, have a management agreement.

**ANSWER:**

**INTERROGATORY NO. 6:** With respect to any facility identified in response to interrogatory no. 5 above, identify the date on which such management agreement was entered into.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 2:** With respect to any facility identified in response to interrogatory no. 5 above, produce or provide for inspection the documents evidencing such management agreement including, but not limited to, a copy of the management agreement.

**RESPONSE:**

**INTERROGATORY NO. 7:** Identify each and every law firm that has provided services for CSC since it was formed.

**ANSWER:**

**INTERROGATORY NO. 8:** Identify the individual(s) responsible for or involved with selecting the law firm(s) identified in response to interrogatory no. 7 above.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. 3 :** Produce or provide for inspection a copy of all documents evidencing any engagement to provide legal services by the law firms identified in response to interrogatory no. 7 above.

**RESPONSE:**

**REQUEST TO ADMIT NO. 2:** Admit that Foulston Siefikin, LLP provided or provides legal services to CSC.

**RESPONSE:**

**INTERROGATORY NO. 9:** If your response to Request to Admit No. 2 is anything other than an unqualified admission, please state specifically the reason therefore and describe specifically the relationship between Foulston Siefikin, LLP and CSC.

**ANSWER:**

**INTERROGATORY NO. 10:** Identify the time period during which Foulston Siefikin, LLP provided legal services to CSC.

**ANSWER:**

**REQUEST TO ADMIT NO. 3:** Admit that Nueterra/ASC or Nueterra/ASC Management invests in or possesses a financial interest in (whether as owner, security holder, creditor, consultant or otherwise) a healthcare facility or facilities that offers services similar to those offered within CSC that operates in whole or in part within a 30 mile radius of CSC.

**RESPONSE:**

**INTERROGATORY NO. 11:** Identify each and every healthcare facility in which Nueterra/ASC or Nueterra/ASC Management, directly or indirectly or through one or more of their Affiliates, invests or possesses a financial interest (whether as owner, security holder, creditor, consultant or otherwise) that offers services similar to those offered within CSC that operates in whole or in part within a 30 mile radius of CSC.

**ANSWER:**

Respectfully submitted,

Gerardo R. Rollison
Jennifer J. Dawson

By ______________________

EXHIBIT

A

# OPERATING AGREEMENT

# OF

# COLUMBUS SURGICAL CENTER, LLC
## (A OHIO LIMITED LIABILITY COMPANY)

The LLC Membership Interests represented by these Regulations have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended, under the Ohio securities laws in reliance upon exemptions under those Acts, or under the securities laws of any other state. The sale or other disposition of the Membership Interests is restricted as stated in these Regulations, and in any event is prohibited unless the Company receives an opinion of counsel satisfactory to it and its counsel that such sale or other disposition can be made without registration under the Securities Act of 1933, as amended, the Ohio securities laws or other applicable state securities laws. By acquiring the Membership Interests, the Member represents that it will not sell or otherwise dispose of his, her or its Membership Interest without registration or other compliance with the Acts and the rules and regulations under those Acts.

## TABLE OF CONTENTS

Page No.


ARTICLE I - FORMATION OF THE COMPANY ..... 5
1.1 Formation ..... 5
1.2 Name ..... 5
1.3 Registered Office and Statutory Agent ..... 5
1.4 Principal Place of Business ..... 5
1.5 Purposes and Powers ..... 5
1.6 Term ..... 6
1.7 Nature of Members' Interests ..... 6
ARTICLE II – DEFINITIONS ..... 6
2.1 Definitions ..... 6
ARTICLE III – MANAGEMENT OF THE COMPANY ..... 15
3.1 Board of Managers ..... 15
3.2 Management Agent ..... 15
3.3 Compensation and Expenses ..... 15
3.4 Indemnification ..... 15
3.5 No Liability for Return of Capital Contribution ..... 16
ARTICLE IV – RIGHTS AND OBLIGATIONS OF MEMBERS ..... 16
4.1 Eligibility Requirements of Members ..... 16
4.2 Limitation on Size of Holdings ..... 16
4.3 Names and Addresses of Members ..... 17
4.4 No Management by Members ..... 17
4.5 Election of Managers ..... 17
4.6 Action by Members ..... 17
4.7 Limited Liability; Guarantees ..... 17
4.8 Bankruptcy or Incapacity of a Member ..... 18
4.9 Restrictive Covenant Applicable to Members ..... 18
4.10 Other Business Ventures and Activities; Conflicts of Interest ..... 18
4.11 Payment of Fees and Costs ..... 19
4.12 Management Agreement ..... 20
ARTICLE V – MEETINGS OF MEMBERS ..... 20
5.1 Annual Meeting ..... 20
5.2 Place of Meetings ..... 20
5.3 Substitute Annual Meeting ..... 20
5.4 Special Meetings ..... 21
5.5 Notice of Meetings ..... 21
5.6 Quorum ..... 21
5.7 Members' List ..... 21
5.8 Voting of Members ..... 21
5.9 Action Without Meeting ..... 22
ARTICLE VI – BOARD OF MANAGERS ..... 22
6.1 General Powers ..... 22
6.2 Limitations on Power and Authority of Board of Managers ..... 24

6.3 Number, Term and Qualification ..... 24
6.4 Removal ..... 24
6.5 Vacancies ..... 24
ARTICLE VII – MEETINGS OF BOARD OF MANAGERS ..... 25
7.1 Annual and Regular Meetings ..... 25
7.2 Special Meetings ..... 25
7.3 Notice of Meetings ..... 25
7.4 Quorum ..... 25
7.5 Manner of Acting ..... 25
7.6 Presumption of Assent ..... 25
7.7 Action Without Meeting ..... 26
7.8 Meeting by Communications Device ..... 26
ARTICLE VIII – MANAGERS AND OFFICERS OF THE BOARD OF MANAGERS ..... 26
8.1 Titles ..... 26
8.2 Election ..... 26
8.3 Removal ..... 26
8.4 Vacancies ..... 26
8.5 Compensation ..... 26
8.6 Chairperson ..... 27
8.7 Vice Chairperson ..... 27
8.8 Secretary/Treasurer ..... 27
8.9 Assistant Secretary/Treasurer ..... 28
ARTICLE IX – CAPITAL CONTRIBUTIONS AND LOANS ..... 28
9.1 Initial Capital Contributions ..... 28
9.2 Additional Funds ..... 28
9.3 Additional Capital Contributions ..... 29
9.4 No Interest on Capital ..... 29
9.5 Capital Accounts ..... 29
9.6 Return of Capital ..... 30
ARTICLE X – ALLOCATIONS, ELECTION AND REPORTS ..... 31
10.1 Profits and Losses ..... 31
10.2 Nonrecourse Deductions ..... 31
10.3 Member Nonrecourse Deductions ..... 31
10.4 Allocations Between Transferor and Transferee ..... 31
10.5 Gains from Capital Transactions ..... 32
10.6 Contributed Property ..... 32
10.7 Minimum Gain Chargeback ..... 32
10.8 Member Minimum Gain Chargeback ..... 33
10.9 Qualified Income Offset ..... 33
10.10 Gross Income Allocation ..... 33
10.11 Section 754 Adjustment ..... 33
10.12 Curative Allocations ..... 34
10.13 Compliance with Treasury Regulations ..... 34
10.14 Tax Withholding ..... 34
ARTICLE XI – DISTRIBUTIONS ..... 35
11.1 Cash Flow ..... 35

11.2 Refinancing Proceeds and Sales Proceeds ..... 35
11.3 Distributions in Liquidation ..... 35
11.4 Limitation Upon Distributions ..... 35
ARTICLE XII – TRANSFER OF INTERESTS AND ADMISSION OF MEMBERS ..... 35
12.1 Restrictions on Transfer ..... 35
12.2 Conditions Precedent to Transfers ..... 36
12.3 Substituted Members ..... 36
12.4 Rights of Transferee ..... 37
12.5 Rights of First Refusal ..... 37
ARTICLE XIII – BUY SELL ..... 37
13.1 Buy-Sell ..... 37
13.2 Notice ..... 39
13.3 Purchase Option ..... 39
13.4 Assignment of Purchase Option ..... 39
13.5 Agreement on Valuation ..... 40
13.6 Closing ..... 40
13.7 Effect on Withdrawing Member's Interest ..... 40
13.8 Issuance of Replacement Units ..... 40
ARTICLE XIV – DISSOLUTION AND LIQUIDATION OF THE COMPANY ..... 41
14.1 Dissolution Events ..... 41
14.2 Liquidation ..... 41
14.3 Articles of Dissolution ..... 42
ARTICLE XV – UNIT CERTIFICATES ..... 42
15.1 Certificates ..... 42
15.2 Replacement Certificates ..... 42
15.3 Transfers ..... 42
15.4 Unit Register ..... 42
15.5 Rights of Registered Owners ..... 43
ARTICLE XVI – MISCELLANEOUS ..... 43
16.1 Records ..... 43
16.2 Reserves ..... 43
16.3 Notices ..... 43
16.4 Amendments ..... 43
16.5 Additional Documents ..... 44
16.6 Representations of Members ..... 44
16.7 Survival of Rights ..... 44
16.8 Interpretation and Governing Law ..... 44
16.9 Severability ..... 44
16.10 Agreement in Counterparts ..... 44
16.11 Tax Matters Manager ..... 44
16.12 Creditors Not Benefited ..... 45
16.13 Accounting Method ..... 45
Schedule I ..... 46

# OPERATING AGREEMENT

# OF

# Columbus Surgical Center, LLC

This OPERATING AGREEMENT of Columbus Surgical Center, LLC (the "Company"), a limited liability company organized pursuant to the Ohio Secretary of State (the "Act"), was executed effective as of August 13, 2002, by and among the Company and its Member(s) (as defined below).

## ARTICLE I - FORMATION OF THE COMPANY

**1.1 Formation.** The Company has been formed (or will be formed) by the filing with the office of the Ohio Secretary of State (the "Secretary") of the Articles of Organization of the Company. In consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the rights and obligations of the parties and the administration and termination of the Company shall be governed by this Agreement, the Articles of Organization and the Act.

**1.2 Name.** The name of the Company is Columbus Surgical Center, LLC. The Members may change the name of the Company from time to time, as they deem advisable, provided appropriate amendments to this Agreement and the Articles of Organization and necessary filings under the Act are first obtained.

**1.3 Registered Office and Statutory Agent.** The Company's registered office within the State of Ohio and its statutory agent at such address shall be as the Board of Managers may from time to time deem necessary or advisable.

**1.4 Principal Place of Business.** The principal place of business of the Company shall be at such place or places as the Board of Managers shall from time to time deem necessary or advisable.

**1.5 Purposes and Powers.**

1.5.1 The purposes and business of the Company shall be to operate surgical center or other health facility in the Columbus, Ohio area which is appropriately licensed by the necessary Ohio and federal authorities having jurisdiction over facilities of the type to be operated by the Company; and (ii) to engage in any such lawful business which a limited liability company may pursue under the Act.

1.5.2 The Company shall have any and all powers that are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act.

**1.6 Term.** The Company shall continue in existence in perpetuity from the date of its formation, unless the Company is earlier dissolved and its affairs wound up in accordance with the provisions of this Agreement or the Act.

**1.7 Nature of Members' Interests.** The interests of the Members in the Company shall be personal property for all purposes. Legal title to all Company assets shall be held in the name of the Company. Neither any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property or the right to partition any Property owned by the Company.

## ARTICLE II – DEFINITIONS

**2.1 Definitions.** Some terms used in this Agreement are expressly defined in other provisions of this Agreement and shall have the meanings set forth therein. In addition, the following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

2.1.1 "Act" means the Secretary of State, as the same may be amended from time to time.

2.1.2 "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amounts to which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

2.1.3 "Adjusted Capital Contributions" means, as of any day, a Member's Capital Contributions adjusted as follows:

(a) Increased by the amount of any Company liabilities which, in connection with Distributions, are assumed by such Member or are secured by any Property distributed to such Member, and

(b) Reduced by the amount of cash and the Gross Asset Value of any Property distributed to such Member and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In the event any Member transfers all or any portion of its Membership Interest in accordance with the terms of this Agreement, the Member's Transferee shall succeed to the Adjusted Capital Contribution of the Transferor to the extent it relates to the transferred Membership Interest or portion thereof.

2.1.4 "Affiliate" of a specified Person means (i) any Person directly or indirectly controlling, controlled by or under common control with the specified Person; (ii) any officer, director, member, or partner of the specified Person; or (iii) any entity if the specified Person is an officer, director, member, partner, or employee, of the entity for which the specified Person acts in such capacity.

2.1.5 "Agreement" means this Operating Agreement, as amended from time to time.

2.1.6 "Articles of Organization" means the Articles of Organization of the Company filed with the Secretary, as amended or restated from time to time.

2.1.7 "ASC" means ASC Group, LC, a Utah limited liability company.

2.1.8 "ASC Management" means ASC Management, L.L.C., a Utah limited liability company and an Affiliate of ASC.

2.1.9 "Board of Managers" means the board that shall manage the business of the Company pursuant to Article VI of this Agreement. The Board of Managers is also sometimes referred to herein as the "Board." Until the first meeting of the Members, at which the Board of Managers will be elected, ASC shall, notwithstanding any other provisions hereof, constitute the entire Board of Managers and have all of the powers and rights attendant thereto, and in such capacity may be referred to as the "Initial Manager".

2.1.10 "Board Member" means a member of the Board of Managers of the Company as elected or appointed from time to time pursuant to this Agreement.

2.1.11 "Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with this Agreement.

2.1.12 "Capital Contribution" means all contributions of cash or property (valued for this purpose at initial Gross Asset Value) made by a Member or its predecessor in interest.

2.1.13 "Capital Transaction" means any transactions undertaken by the Company or by any entity in which the Company owns an interest, which, were it to generate proceeds, would produce Company Sales Proceeds or Company Refinancing Proceeds.

2.1.14 "Cash Flow" for any period means the excess, if any, of (A) the sum of (i) all gross receipts from any source for such period, other than from Company loans, Capital Transactions and Capital Contributions, and (ii) any funds released by the Company from previously established reserves, over (B) the sum of (i) all cash expenses paid by the Company for such period, (ii) all amounts paid by the Company in such period on account of the amortization of the principal of any debts or liabilities of the Company (including loans from any Member), (iii) capital expenditures of the Company and (iv) a reasonable reserve for future expenditures as provided by Article VI; provided, however, that the amounts referred to in (B) (i), (ii) and (iii) above shall be taken into account only to the extent not funded by Capital Contributions, loans or payments out of previously established reserves. Such term shall also include all other funds deemed available for distribution and designated as Cash Flow by the Board.

2.1.15 "Class I Units" means those Membership Interests consisting of up to 72 Units offered in the Offering and/or issued exclusively to persons who or that meet the eligibility criteria set forth in this Agreement, together with any units that are converted into Class I Units under the terms hereof.

2.1.16 "Class II Units" means those Membership Interests offered and/or issued to ASC in the Offering as described in the PPM and subject to the limits set forth in this Agreement, together with any units that are converted into Class II Units under the terms hereof.

2.1.17 "Code" means the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law).

2.1.18 "Cumulative Net Return on Capital" means the Company's cumulative net income, after deductions for all operating, selling, general and administrative expenses, interest, taxes and extraordinary items expressed as a percentage of the aggregate capital contributions (in the form of cash or property or services, in which case the fair market value of such property or services shall be deemed to be capital contributions) contributed to the Company by its Members at any time in exchange for Units.

2.1.19 "Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year,

Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

2.1.20 "Disinterested Member" means a Member who is not related (within the meaning of Section 267(b) of the Code) to either the Member whose Membership Interest is to be transferred as provided in Article XII or the proposed Transferee of such Membership Interest.

2.1.21 "Distributable Cash" means with respect to the Company at any time, all funds of the Company on hand or in bank accounts of the Company as, in the discretion of the Board, are then available for Distribution to the Members after provision has been made for (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for such reserves as the Board deems necessary or appropriate for Company operations.

2.1.22 "Distribution" means any money or other Property distributed to a Member with respect to the Member's Membership Interest, but shall not include any payment to a Member for materials or services rendered nor any reimbursement to a Member for expenses permitted in accordance with this Agreement.

2.1.23 "Encumbrance" means any lien, pledge, encumbrance, collateral assignment or hypothecation.

2.1.24 "Facility" means surgical center to be operated by the Company and located on the Site.

2.1.25 "Fiscal Year" means an annual accounting period of each year during the term of the Company as specified by the Board.

2.1.26 "Founders" means those Persons (if any) who acquired Founders Units as described in the PPM. Any Founders Units held by ASC as of the close of the Offering described in the PPM shall be converted into Class II Units. Any Founders Units held by persons other than ASC as of the close of such Offering shall be converted into Class I Units.

2.1.27 "Gains from Capital Transactions" means the gains realized by the Company as a result of or upon any sale, exchange, condemnation or other disposition of capital assets of the Company or any entity in which the Company shall own an interest (which assets shall include Code Section 1231 assets and all real and personal property) or as a result of or upon damage to or destruction of such capital assets.

2.1.28 "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Board, provided that, if the contributing Member and the Board cannot agree on the fair market value of a contributed asset, such determination shall be made by appraisal;

(b) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company (other than upon the initial formation of the Company) by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the Distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704l(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c) The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Board, provided that, if the distributee and the Board cannot agree on the determination of the fair market value of the distributed asset, such determination shall be made by appraisal; and

(d) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and Sections 2.1.47(f) and 10.11 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 2.1.31(d) to the extent the Board determines that an adjustment pursuant to Section 2.1.31(b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 2.1.31(d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Subsections (b), (c), or (d) of this subsection, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits, Gains from Capital Transactions or Losses.

2.1.29 "Liquidator" means the Board of Managers, or any Person appointed by the Board, which will supervise the liquidation of the Company following the occurrence of an event which pursuant to this Agreement shall cause its dissolution.

2.1.30 "Majority in Interest" means a combination of any Members who, in the aggregate, own more than 50% of the Percentage Interests in the Company.

2.1.31 "Management Agent" means ASC Management, L.L.C., a Utah limited liability company ("ASC Management"), or such other Person who will manage the day-to-day business and affairs of the Facility.

2.1.32 "Management Agreement" means the Development and Management agreement among the Company and ASC and ASC Management pursuant to which ASC Management or an Affiliate will manage the day-to-day operations of the Facility.

2.1.33 "Member" means each Person designated as a Member of the Company, on Schedule I hereto, or any other Person admitted as a Member of the Company in accordance with this Agreement or the Act. "Members" refers to such Persons as a group.

2.1.34 "Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i).

2.1.35 "Member Nonrecourse Debt" has the same meaning as either "partner nonrecourse debt" or "partner nonrecourse liability" as defined in Treasury Regulations Section 1.704-2(b)(4), and means any nonrecourse debt (for the purposes of Treasury Regulations Section 1.1001-2) of the Company for which any Member bears the "economic risk of loss," within the meaning of Treasury Regulations Section 1.752-2.

2.1.36 "Member Nonrecourse Deductions" has the same meaning as "partner nonrecourse deductions" as described in Treasury Regulations Section 1.704-2(i). The amount of Member Nonrecourse Deductions with respect to Member Nonrecourse Debt for any Fiscal year equals the excess, if any, of (a) the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during Fiscal Year, over (b) the aggregate amount of any Distributions during that Fiscal Year to the Member that bears the economic risk of loss of such Member Nonrecourse Debt to the extent such Distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.7042(i).

2.1.37 "Membership Interest" means all of a Member's rights in the Company, including without limitation, the Member's share of the Profits and Losses of the Company, the right to receive Distributions of the Company's assets (including such

Member's Capital Account and all incidents thereto under this Agreement), any right to vote and any right to participate in the management of the Company as provided in the Act and this Agreement.

2.1.38 "Minimum Gain" has the same meaning as "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(d).

2.1.39 "Nonrecourse Deductions" means "nonrecourse deductions" as set forth in Treasury Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a given Fiscal Year equals the excess, if any, of (a) the net increase, if any, in the amount of Minimum Gain during such Fiscal Year, over (b) the aggregate amount of any Distributions during such Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Minimum Gain, determined according to the provisions of Treasury Regulations Section 1.704-2(h).

2.1.40 "Nonrecourse Liability" has the same meaning as set forth in Treasury Regulations Section 1.704-2(b)(3), and means any Company liability (or portion thereof) for which no Member bears the "economic risk of loss," within the meaning of Treasury Regulations Section 1.752-2.

2.1.41 "PPM" means the Private Placement Memorandum offering Units in the Company in the "Offering".

2.1.42 "Percentage Interest" means, with respect to each Member, the number of Units (regardless of the Class of such Units) owned by such Member divided by the total number of issued and outstanding Units (regardless of Class). The initial Percentage Interests of the Members are set forth on Schedule I.

2.1.43 "Person" means an individual, a trust, an estate, a domestic corporation, a foreign corporation, a professional corporation, a partnership, a limited partnership, a limited liability company, a foreign limited liability company, an unincorporated association or other entity.

2.1.44 "Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year or period (excluding Gains from Capital Transactions), determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section (excluding Gains from Capital Transactions) shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be subtracted from such taxable income or loss;

(c) In the event the Gross Asset Value of any Company asset is adjusted pursuant to the other express provisions of this Agreement, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purpose of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with this Agreement 2.1.22 hereof;

(f) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(g) Notwithstanding any other provision of this Section , any items which are specially allocated pursuant to any sections in Article X addressing Nonrecourse Deductions , Member Nonrecourse Deductions, Minimum Gain Chargeback, Member Minimum Gain Chargeback, Qualified Income Offset, Gross Income Allocation, Section 754 Adjustment, and Curative Allocations shall not be taken into account in computing Profits and Losses but shall be determined by applying rules analogous to those set forth in Subsections (a) through (f) above.

2.1.45 "Property" means (i) any and all property acquired by the Company, real and/or personal (including, without limitation, intangible property), and (ii) any and all of the improvements constructed on any real property.

2.1.46 "Refinancing Proceeds" means (i) the cash realized from the financing or refinancing of all or any portion of the Property or other Company assets, less the retirement of any related mortgage loans and the payment of all expenses relating to the transaction and a reasonable reserve for future expenditures as provided by Section 16.2 and (ii) the Company's allocable portion of cash realized by an entity in which the Company owns an interest from such entity financing or refinancing all or any portion.

2.1.47 "Sales Proceeds" means (i) the cash realized from the sale, exchange, condemnation, casualty or other disposition of all or any portion of the Property or other Company assets, less the retirement of any related mortgage loans and the payment of all expenses relating to the transaction and a reasonable reserve for future expenditures as provided by Section 16.2 and (ii) the Company's allocable portion of cash realized by an entity in which the Company owns an interest from the sale, exchange, condemnation, casualty or other disposition of all or any portion of such entity's assets, less the retirement of any related mortgage loans and the payment of all expenses relating to such transaction and a reasonable reserve for future expenditures as provided by Section 16.2.

2.1.48 "Secretary" means the secretary of the Company, unless the context requires otherwise.

2.1.49 "Site" means the parcel of land in the Columbus, Ohio area on which the Facility is or will be located.

2.1.50 "Supermajority Vote" means the affirmative vote or consent of Members holding at least 60% of the Percentage Interests held by Members.

2.1.51 "Target Market" means the area in an around Columbus, Ohio.

2.1.52 "Transfer" means the sale, conveyance, pledge, grant of security interest in, hypothecation or transfer by any other means of Units in the Company. "Transferor" refers to the Member effecting the Transfer. "Transferee" means the Person to whom the Transfer is intended.

2.1.53 "Transfer Notice" means the written notice certifying a Member's intent to Transfer his or her Membership Interest.

2.1.54 "Treasury Regulations" means the regulations promulgated by the United States Department of the Treasury under the Code (or under any applicable successor thereto).

2.1.55 "Unit(s)" means the increments of Membership Interest offered or authorized to be offered to investors as either Class I or Class II Units in the Company's Private Placement Memorandum dated August 13, 2002, and the increments of Membership Interest authorized for issuance under the other provisions of this Agreement. Class I Units and Class II Units shall be treated identically in most respects.

2.1.56 "Withdrawing Member" means any Member with respect to whom a Buy-Sell Event has occurred.

## ARTICLE III – MANAGEMENT OF THE COMPANY

**3.1 Board of Managers.** There shall be five members of the Company's Board of Managers ("Board Members") who shall be elected or appointed as set forth in this Agreement, and, except as otherwise may be expressly provided in this Agreement, the Articles of Organization or the Act, all decisions with respect to the management of the business and affairs of the Company shall be made by action of the Board of Managers. Each Board Member's liability to the Company and its Members shall be limited to the maximum extent permitted by the Act and any other applicable law; provided, however, nothing contained herein shall eliminate or limit the liability of a Board Member for any breach of the Board Member's duty of loyalty to the Company or its Members, for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or for any transaction from which the Board Member derived an improper personal benefit.

**3.2 Management Agent.** The Company shall engage ASC Management as a Management Agent to oversee the construction of the Facility as well as to conduct, supervise and direct the day-to-day operations of the Company under the supervision of the Company's Board of Managers pursuant to a Management Agreement as described in this Agreement. The Board of Managers, in particular, may approve the purchase of major equipment. The Board may also call for a review or audit of the Management Agent's services and the Company's financial condition.

**3.3 Compensation and Expenses.** Board Members shall not receive any compensation from the Company for serving as such, but the Company will reimburse Board Members for expenses incurred in connection with their service to the Company. Nothing contained in this Section is intended to affect the Percentage Interest of a Board Member who is also a Member or the amounts that may be payable to such person by reason of his or her respective Percentage Interest. Notwithstanding the foregoing, Board Members shall be reimbursed for self-employment taxes, if any, assessed and paid by Board Members which are directly related to their serving upon the Board of Managers for the Company.

**3.4 Indemnification.** The Company shall indemnify Board Members and the Management Agent (and its managers, officers, members, employees and agents) to the fullest extent permitted or required by the Act against claims, causes of action, suits, fees or costs brought against, or incurred by, Board Members or the Management Agent by non-Members as a result of the performance of their respective duties, and the Company may advance expenses incurred by Board Members and the Management Agent (and its managers, officers, members, employees and agents) upon the approval of a Majority in Interest of the Members and the receipt by the Company of the signed statement of a Board Member or the Management Agent agreeing to reimburse the Company for such advance in the event it is ultimately determined that such Person is not entitled to be indemnified by the Company against such expenses. The provisions of this Section shall apply also to any Person to whom the Board of Managers has delegated

management authority as otherwise permitted herein. The obligation of the Company to indemnify the Board Members or the Management Agent shall not extend to any negligence or acts of willful misconduct resulting in claims, causes of action, suits, fees or costs brought against any Board Member as a result of his or her breach of this Agreement or for any conduct for which such Board Member could be liable under Section 3.1 above or against the Management Agent by the Company or as a result of a breach of the Management Agreement.

**3.5 No Liability for Return of Capital Contribution.** The Board Members and Management Agent shall not be liable for the return of the Capital Contributions of the Members, and upon dissolution, the Members shall look solely to the assets of the Company.

## ARTICLE IV – RIGHTS AND OBLIGATIONS OF MEMBERS

**4.1 Eligibility Requirements of Members.** Except as otherwise provided within this Agreement, no Person shall be admitted as a Member unless such Person satisfies the eligibility requirements of one of the classes described below:

4.1.1 Class I Units. No Person shall be eligible to purchase or hold Class I Units, other than surgeons who commonly practice at a local hospital and who could perform surgical or procedure based services at, or admit patients to, the Facility for which the Company can be reimbursed by Medicare.

4.1.2 Class II Units. The initial owner of the Class II Units shall solely be ASC.

**4.2 Limitation on Size of Holdings.** No physician Member of the Company shall be entitled to acquire more than a combined total of 4 Units in the Company, except as otherwise authorized by the Initial Manager in the Offering. ASC may not hold more than 20 Class II Units(with the option to buy five (5) additional Class II Units if Class I Units are left unsold near the end of the Offering). In addition, no Member may own fewer than 2 Units, unless the Managers approve the purchase of one-half Unit by a particular investor. Notwithstanding the foregoing, the Unit maximum will be applied to entities eligible for Class I membership based upon the number of individual physicians holding beneficial ownership interests in such entities (i.e., if an entity consists of five (5) non-Founder physician shareholders, such entity and/or its shareholders can collectively hold up to five (5) times 4 Units in the Company). In addition, in the event that a Buy/Sell Event, as described in Article XII herein, should occur to a single constituent physician of an entity Member, then if approved by the Board of Managers in its sole discretion, the entity Member may be afforded the opportunity, for a period of 365 days, to add an additional constituent physician, rather than lose a proportionate right to ownership previously represented by the affected physician.

In the event of a "forward" or "reverse" split in the number of Units of the Company, the maximum number of Units that may be held by a Member shall increase or decrease in proportion to such split.